ORDERED.

**Dated:  December 18, 2020**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re | ) |
| | ) |
| Walden Palms Condominium | ) Case No. 6:18-bk-7945-KSJ |
| Association, Inc., | ) Chapter 11 |
| | ) |
| Debtor(s). | ) |

## MEMORANDUM OPINION CONFIRMING
## DEBTOR'S AMENDED PLAN OF REORGANIZATION

Debtor, Walden Palms Condominium Association, and a creditor, LAD Commercial, LLC ("LAD"), have filed competing plans seeking to reorganize this condominium association. Because LAD's Plan[1] does not comply with several provisions of 1129(a) of the Bankruptcy Code,[2] it is not confirmable. Debtor, however, has cleared all hurdles to allow confirmation of its plan.[3]

---

[1] Doc. No. 751. LAD filed a Disclosure Statement. Doc. No. 752. LAD also filed a Confirmation Affidavit of Leigh C. Katzman. Doc. No. 793. Debtor Objected to LAD's Plan. Doc. No. 783.

[2] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et. seq.*

[3] Doc. No. 749. Debtor filed an Amended Disclosure Statement. Doc. No. 750. Debtor also filed a Confirmation Affidavit in Support of the Amended Plan. Doc. No. 784. LAD filed an Objection to Debtor's Amended Plan. Doc. No. 785. The confirmation hearing occurred on October 19, 2020.

Debtor, a Florida not-for-profit corporation formed in 2006,[4] manages the condominium association known as Walden Palms Condominium Association. The association consists of 400 individual residential condominium units. Each unit owner has an undivided interest in the condominium's common elements including a clubhouse, swimming pool, and lake. Virtually all the unit owners are investors who rent their units to local residents.

Debtor was negatively affected by the general economic downturn of 2008, the effects of which continue until today. Many unit owners failed to pay their regular assessments. Debtor's prior management could not collect these unpaid assessments. And the Debtor experienced substantial cash flow shortages preventing it from maintaining and repairing the buildings and common areas. The 400 condominiums slowly spiraled into a distressed community.

The City of Orlando rightfully imposed numerous code violations and eventually filed nineteen liens, totaling over $24 million. Debtor also was named a defendant in several collection and civil lawsuits, seeking upwards of $8 million, including one action filed by LAD. To address these overwhelming problems of owners not paying assessments, continuing property deterioration, the imposition of significant government liens, and numerous collection lawsuits, the Debtor filed this Chapter 11 case on December 24, 2018.[5]

---

[4] *See* LAD's Exhs. 1 and 2.
[5] Doc. No. 1.

Since filing bankruptcy, the Debtor, assisted by the automatic stay stopping the pending litigation, has turned the corner on its reorganization efforts. Debtor appointed a new President, Philip Masi, and a new, engaged Board of Directors. Debtor has completed repairs on all but six of its twenty buildings. If the Debtor repairs the remaining six buildings, as it anticipates, the City of Orlando has agreed to extinguish its outstanding liens of over $24 million. Unit owners now are timely paying regular assessments, and more important, paying *double* the regularly assessed amounts to infuse at least $4 million in new monies to fund the needed renovations and restore the Debtor's finances in the foreseeable future. Debtor has reached agreements with *every* creditor except one—LAD.

LAD, a debt collection agency, however, has resisted all efforts to work with the Debtor. Between 2010-2012, the law firm of Katzman Garfinkel, P.A. ("Katzman") collected delinquent association fees due to the Debtor.[6] Katzman asserts it was not paid for this legal work conducted almost ten years ago. After 2012, Katzman assigned its claims against the Debtor to LAD, who filed a five-count complaint against Debtor in Florida State Circuit Court seeking to recover Katzman's unpaid legal fees. Debtor has various claims against Katzman and defenses to these state court claims, which were stayed during this bankruptcy case. LAD filed a proof

---

[6] *See* LAD's Exh. 7. Debtor and Katzman entered into a Retainer Agreement.

of claim for $1,075,641.78, premised on Katzman's allegedly unpaid legal fees.[7]
Debtor vigorously objects to LAD's Claim arguing it should be disallowed.[8]

After reaching deals with all of its substantial creditor body, including its unit
owners, the Debtor filed its initial Plan of Reorganization.[9] LAD successfully opposed
confirmation because the Debtor's initial plan impermissibly classified and treated
LAD's claim differently from the other general unsecured creditors. By that point, the
exclusivity period allowing only the Debtor to propose a plan had expired. Any
interested party could file a new or amended plan by August 23, 2020.[10] Both the
Debtor and LAD timely filed competing plans. Debtor's Amended Plan[11] and LAD's
Plan[12] are largely similar except for the treatment of claims held by the general
unsecured creditors.

Debtor's Amended Plan consists of six classes of claims, three of which are
impaired.[13] The Amended Plan provides for complete resolution of the City of
Orlando's liens, physical rehabilitation of the condominium buildings, and full
payment of all administrative costs. The Amended Plan also provides for full

---

[7] *See* Claim No. 42-1. LAD specifically requests $354,111.24 for the principal amount owed under the parties' Retainer Agreement, $375,978.82 for contractual interest, and $345,551.72 for attorneys' fees and costs incurred in state court litigation on the breach of contract claim. LAD's claim is disputed but has been temporarily allowed for voting purposes. Doc. No. 710.
[8] Doc. No. 435. *See also* Doc. No. 434. Debtor contends the parties' Retainer Agreement was unfairly drafted because it did not accurately reflect its verbal agreement with Katzman. Debtor also contends Katzman incurred excessive fees in relation to the amount of delinquent assessments collected.
[9] Doc. No. 550. The Court ruled on the Debtor's First Plan on July 29, 2020.
[10] Doc. No. 742.
[11] Doc. No. 749.
[12] Doc. No. 751.
[13] *See* Doc. Nos. 749 and 750. The six classes include: (1) Secured Claims of the City of Orlando (impaired), (2) Secured Property Tax Claims, (3) Secured Claims of First Mortgages (impaired), (4) Secured Claims of Second Mortgages, (5) General Unsecured Claims, and (6) Equity Interest (impaired).

satisfaction of the Property Tax Claims, alternate treatment for First Mortgages, and leaves Second Mortgages unaltered. Debtor proposes to fund the Amended Plan through the anticipated balance in its Debtor-in-Possession accounts, unit sale proceeds, increased regular monthly assessments, special assessments, and proceeds from future litigation or settlements. Virtually all of Debtor's regular income is generated through the collection of assessments, which are paid by the individual unit owners.

In its Amended Plan, the Debtor properly included all unsecured creditors, including LAD, in Class 5.   These unsecured creditors will split a "pot" of approximately $240,000 over 24 months. Excluding LAD's asserted claim of a little more than $1 million, the other unsecured claims total about $81,000. So, distributions to unsecured creditors under the Debtor's Amended Plan will range from approximately 21% to 100%, depending on the liquidation amount for LAD's claim. Debtor is treating all unsecured creditors similarly and paying them a sizable distribution. The Court notes every unsecured creditor, except LAD, voted for Debtor's Amended Plan indicating their consent to these proposed payments.[14]

LAD's Plan is largely similar to Debtor's Amended Plan except for increased payments to the unsecured creditors, primarily to benefit LAD. LAD's Plan proposes to pay the general unsecured creditors 100% of their allowed claims. All unsecured non-LAD creditors holding claims of about $81,000 would receive payment in full

---

[14] Doc. No. 805.

over 12 months without interest. Once those non-LAD unsecured claims are paid, the Debtor would pay LAD's entire claim in 36 monthly installments, beginning in the second year of its Plan.[15]

Because Section 1129(c) of the Bankruptcy Code[16] allows for confirmation of only one plan, the first step is to determine if both competing plans are confirmable. If one is not confirmable, the Court need not consider the factors used to evaluate competing plans.[17] Here, the Court concludes that LAD's Plan is not confirmable for several reasons.

### LAD's Plan is Not Confirmable

Section 1129(a) is the blueprint listing each element a plan proponent must establish to confirm a Chapter 11 Plan. All sixteen requirements must be met, unless 1129(b) applies.[18] For example, the proponent must show the plan has been proposed in good faith and not forbidden by law, the plan identifies the debtor's directors and officers to serve after confirmation and their appointment or continuance in such office follows public policy, and that the plan is feasible.[19] The bankruptcy court has an independent duty to ensure each element under § 1129(a) is met,[20] even if nobody

---

[15] *See* Doc. No. 751, ¶ 4.7.2. If LAD's claim is allowed, LAD will receive, starting in year two of its Plan, 12 equal monthly payments of $16,250, followed by 48 equal monthly payments of $32,500.

[16] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et. seq.*

[17] *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M. D. Fla. 1999).

[18] 11 U.S.C. § 1129(a). Failure to establish § 1129(a)(8) may be overlooked if the plan proponent establishes § 1129(b) and all other requirements of § 1129(a).

[19] 11 U.S.C. § 1129(a)(3), (a)(5)(A)(ii), (a)(11).

[20] *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1299-1300 n. 4 (11th Cir. 2001)("A court must independently satisfy itself that these criteria [in § 1129] are met. Thus, it must consider facts relating to these criteria even in the absence of an objection."); *see also In re Lett*, 632 F.3d 1216, 1229 (11th Cir. 2011).

objects or creditors have voted to accept the plan.[21] The plan proponent must prove each element by a preponderance of the evidence.[22]

Section 1129(a)(3) specifically requires the confirmed plan to comply with all existing laws. LAD's Plan first fails this test. The explanation is a little convoluted, so bear with me.

LAD's claim consists of allegedly unpaid legal fees charged by Katzman between 2010-2012 (plus contractual interest, attorneys' fees, and costs) for Katzman's legal work to collect delinquent assessments against individual unit owners. Under LAD's Plan, the Debtor's Board of Directors must increase the Debtor's annual budget (and correspondingly increase the monthly assessment equally payable by all unit owners) to pay all unsecured claims in full over 4 years. Non-LAD claims are paid in year one. Debtor would pay LAD's claim over years two through four. Each unit owner would pay an equal share of Katzman's bill, even if that unit owner was never delinquent in assessments or involved with any of Katzman's collection efforts. Under LAD's Plan, if the LAD claim is allowed in the amount requested of over $1 million, each unit owner would pay an extra $40 per month in year two, and $90 per month in years three and four simply to pay LAD's claim. This is on top of an already sizeable monthly assessment required to pay normal operating costs.

---

[21] Doc. No. 794. LAD's Plan has been accepted or deemed accepted by all classes of creditors.

[22] *In re Monticello Realty Investments, LLC*, 526 B.R. 902, 912 (Bankr. M.D. Fla. 2015); *In re J.C. Householder Land Trust # 1*, 501 B.R. 441, 447-47 (Bankr. M.D. Fla. 2013).

LAD contends that its claim is a recurring or common expense of the Debtor and may be funded through increased regular assessments over the life of the plan.[23] However, as a matter of undisputed Florida condominium law, LAD errs in classifying its claim for legal fees as a *"common expense."* Florida courts have defined legal fees incurred by an association in the collection of delinquent assessments as *individualized* charges, and not common expenses, because they only affect a single unit.[24] A common expense must benefit or burden all units equally in the condominium project.[25] Legal fees for collecting delinquent assessments are paid from the particular unit owner or his property via a lien, not from the general coffers of the condominium association.

Stated more plainly, all the unit owners do not equally share the cost of legal fees incurred because one owner failed to timely pay his assessments on his particular unit. Only that owner is responsible for the legal fees he caused. Because of this distinction, LAD may not treat its claim as a "common expense" or fund the payment of its claim through increased regular assessments equally paid by all unit owners. LAD has proposed a Plan that, if confirmed, would require the Debtor to violate clear Florida law.

---

[23] Doc. No. 685, ¶ 4. "The legal expenses for the collection of delinquent accounts-*i.e.*, the basis of LAD's claim-is clearly outlined and specifically contemplated in the Declaration as a continuing obligation and certainly is "recurring in nature." LAD fails to cite what provision of the Declaration clearly outlines collection of delinquent accounts as a recurring expense. Rather, a "Common Expense" as defined in the Declaration does not explicitly contemplate collection of delinquent accounts as a recurring expense.

[24] *See United States v. Forest Hill Gardens E. Condo. Ass'n, Inc.*, 990 F. Supp. 2d 1344 (S.D. Fla. 2014); *Catalina West Homeowners Ass'n, Inc. v. Fed. Nat. Mortg. Ass'n*, 188 So. 3d 76, 80 (Fla. 3d DCA 2016).

[25] *Forest Hill Gardens*, 990 F. Supp. 2d at 1347. Common examples include repairs to the roof, elevators, or a swimming pool.

And, even if the Court ignored this violation, I would find that LAD's Plan violates § 1129(a)(5)(A)(ii), which requires identified directors to act consistent with public policy.  If they approved the budget suggested by LAD, every director would violate their fiduciary duty and open themselves to claims by the unit owners.

Further, LAD's Plan is not feasible as required by Section 1129(a)(11).[26] Satisfaction of the feasibility requirement of confirmation requires the plan proponent to show a reasonable expectation of success.[27] The analysis requires the court to determine whether the debtor can complete the things to be done after confirmation as a practical matter.[28] Plans that involve "pipe dreams" or "visionary schemes" are not confirmable.[29]

Debtor cannot pass the payment for LAD's claim along to its unit owners through the regular budget process without violating Florida law. The only other possible way to pay for LAD's claim is for the Debtor to levy a *special assessment* for that purpose. Debtor already has passed a maximum special assessment for each applicable year of its Amended Plan. Any further special assessments of over three percent of its annual budget requires the consent of a quorum majority of unit owners.[30] Based on the evidence at the confirmation hearing, I specifically find it

---

[26] *See* 11 U.S.C. § 1129(a)(11). "Confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

[27] *In re Holley Garden Apartments, Ltd.,* 238 B.R. at 494.

[28] *Id.*

[29] *In re D & G Investments of West Florida, Inc.*, 342 B.R. 882, 886 (Bankr. M.D. Fla. 2006).

[30] *See* LAD's Exhs. 1 and 2.

impossible that the unit owners even could convene the needed quorum majority and, if convened, would approve a higher special assessment to pay LAD's claim in full.

So, LAD has proposed a plan that would require the Board of Directors to do something in violation of Florida law and in violation of the director's fiduciary duty. And, because no other funding option exists, LAD's Plan is not capable of performance and is not feasible. LAD's Plan is not confirmable.

### Debtor's Amended Plan is Confirmed

Conversely, the Court finds that the Debtor has met all requirements of §1129(a) of the Bankruptcy Code, except for §1129(a)(8) requiring an accepting vote by each class.[31] Class 5 creditors holding unsecured claims rejected the Debtor's Amended Plan because LAD, whose claim amount dominates the unsecured class, rejected the plan.[32] The issue then is whether the Debtor can "cram down" its Amended Plan under §1129(b) of the Bankruptcy Code even though LAD has rejected the Amended Plan.

A Chapter 11 bankruptcy often results in some creditors not getting paid in full. The Code provides certain protections to ensure those impaired creditors receiving less than their full claims are treated fairly.[33] If a class of impaired creditors rejects a debtor's proposed plan, a court may only "cram down" the plan over the impaired creditor's objections if at least one impaired creditor accepts the plan and the plan

---

[31] LAD largely does not dispute the Debtor has met all other requirements of §1129(a) of the Bankruptcy Code, as established in Mr. Masi's Affidavit in Support of Confirmation of Debtor's Amended Chapter 11 Plan. Doc. No. 784. As to LAD's argument the Debtor is not acting in good faith, the Court finds just the opposite. Debtor has acted in good faith throughout this bankruptcy case and in proposing the Amended Plan.

[32] All other unsecured creditors cast ballots supporting the Debtor's Amended Plan. Doc. No. 805.

[33] *In re Lett*, 632 F.3d 1216, 1219 (11th Cir. 2011).

conforms to the other provisions outlined in § 1129(a) and (b).[34] "By providing a rigid set of obligations for the court in approving a plan in cram down, Chapter 11 [prevents] a debtor from unfairly discriminating against a specific creditor or group of creditors, [and prevents] obstinate creditors from holding up the approval of an otherwise sound plan of reorganization."[35]

For unsecured creditors, like LAD, the 'fair and equitable' requirement includes the absolute priority rule. "The absolute priority rule, in its simplest terms, requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interests—such as those of equity holders—may share in the assets of the reorganized entity."[36] This makes sense. Shareholders generally should not retain their interests if they do not pay claims senior to them or the creditors do not consent.

However, an exception to the absolute priority rule exists when shareholders infuse substantial "new value" to the debtor. This new value exception requires equity

---

[34] *Id.* (referencing § 1129(a)).
[35] *In re Lett*, 632 F.3d at 1220.
[36] *Matter of Yasparro*, 100 B.R. 91, 95 (Bankr. M.D. Fla. 1989); see also *In re Lett*, 632 F.3d at 1219-20.

holders[37] to make a "fresh contribution" to the insolvent enterprise.[38] When considering a contribution for the new value exception, these factors are considered: (1) is it new, (2) is it substantial, (3) is it money or money's worth, (4) is it necessary for reorganization, and (5) is it reasonably equivalent to the value or interest being received.[39] And when determining whether a contribution reasonably equals the interest being received, courts must consider if a "market test" occurred which tests the adequacy of the equity holders proposed contribution by some type of open exposure to the market.[40]

Because competing plans were filed and the unsecured creditor class rejected (really LAD) the Debtor's Amended Plan, LAD argues the "new value" is insufficient under a "market test."[41] But LAD misses the point. By allowing competing plans, the market test *did* occur as to the sufficiency of the equity holders proposed contribution. All interested parties had an opportunity to file a plan which could address the equity class and any proposed contribution. An open exposure to the market occurred. Only

---

[37] A substantial legal issue exists as to whether a non-profit association like this condominium association is bound by the absolute priority rule. Currently, there is no consensus regarding the application of the absolute priority rule to not-for-profit debtors. Some courts have applied the absolute priority rule to not-for-profits; others equivocate on whether the absolute priority rule applies to not-for-profits, engaging in a fact-specific analysis. *See Wabash Valley Power Ass'n*, 72 F.3d 1305 (7th Cir. 1995); *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444 (B.A.P. 9th Cir. 2002); *In re Indian Nat. Finals Rodeo Inc.*, 453 B.R. 387 (Bankr. D. Mont. 2011); *In re Gen. Teamsters, Warehousemen & Helpers Union Local 890*, 225 B.R. 719 (Bankr. N.D. Cal. 1998); *In re S.A.B.T.C. Townhouse Ass'n.*, 152 B.R. 1005 (Bankr. M.D. Fla. 1993). The referenced cases involve a wide variety of debtors including unions, homeowners' associations, hospitals, rodeos, and power cooperatives. Because the Court finds the Debtor meets the new value exception to absolute priority rule, the Court declines to determine whether the absolute priority rule even applies to the Debtor.

[38] *In re Lett*, 632 F.3d 1216, 1220 n.6 (11th Cir. 2011); *see also Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 442 (1999); *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 202 (1939).

[39] *Id.* at 442. See also *In re Henderson*, 341 B.R. 783, 791 (M.D. Fla. 2006).

[40] *LaSalle*, 526 U.S. at 457-58.

[41] Doc. No. 785, ¶ 21.

two parties filed proposed plans. LAD's plan failed not because it was not tested in the relevant "market" but because it violates Florida law, while the Debtor's Amended Plan does not.

Debtor's Amended Plan proposes equity holders contribute the maximum allowed under Florida law and these circumstances. And although the unsecured class did reject the Debtor's Amended Plan, it was only LAD (who controls the class) which rejected it. Having considered all the factors for the new value exception, I find the Debtor has satisfied the new value exception to the absolute priority rule.

Debtor's Amended Plan does not unfairly discriminate against LAD and is fair and equitable. Debtor's unit owners have contributed over $4 million in new money since this case was filed. They are working mightily to fix the numerous code violations and satisfy the liens of the City of Orlando, which exceed $24 million. Although the unit owners one day may benefit from these repairs by retaining repaired and rentable units, today, the City of Orlando is by far the Debtor's largest creditor. Without these large cash infusions, the City of Orlando could foreclose upon its liens at immense harm to the unit owners, the numerous mortgage companies who financed the purchases of the 400 units, the taxing authorities with real estate taxes due on the units, and the non-LAD unsecured creditors. No creditor would receive any distributions if the unit owners did not contribute this new value. So, while it is regrettable that LAD may not receive 100% of its claim, the Court finds the Debtor has satisfied the cram down requirements under § 1129(b) of the Bankruptcy Code, and its Amended Plan is confirmed.

The Court will confirm the Debtor's Amended Plan and deny confirmation of LAD's Plan.[42] Debtor's Amended Plan is more feasible than LAD's Plan considering Florida condominium law. The Debtor's Amended Plan meets all standards of § 1129(a), except subsection (a)(8), but also provides sufficient new value to satisfy the cram down requirements under § 1129(b).

Accordingly, it is

**ORDERED:**

1.      Debtor's First Amended Plan of Reorganization (Doc. No. 749) is **CONFIRMED**.  A separate Confirmation Order simultaneously shall be entered.

2.      Debtor's First Amended Disclosure Statement (Doc. No. 750) is **APPROVED**.

3.      Confirmation of LAD's Plan of Reorganization (Doc. No. 751) is **DENIED.**

4.      Debtor's Objection to LAD's Plan of Reorganization (Doc. No. 783) is **SUSTAINED**.

---

[42] Even if LAD's Plan was confirmable, Section 1129(c) of the Bankruptcy Code provides that only one plan can be confirmed. When multiple plans are confirmable, the following factors are considered to determine which plan should be confirmed: "(1) the type of plan, (2) the treatment of creditors and equity security holders, (3) the feasibility of the plan, and (4) the preferences of creditors and equity security holders." *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999). Having considered these factors, the Court would find that Debtor's Amended Plan is preferable to LAD's Plan. Although the plans are similar, LAD's Plan is simply not feasible. LAD's Plan imposes a substantial financial burden on the Debtor's unit owners which likely will lead to financial ruin of Debtor and many others. Debtor's Amended Plan has a higher likelihood of success while treating all general unsecured creditors similarly and providing them a sizeable distribution. LAD is also the only unsecured creditor which did not accept the Debtor's Amended Plan. Weighing the factors, the feasibility of Debtor's Amended Plan prevails over LAD's desire to be paid its full claim amount.

5.      LAD's Objection to Debtor's First Amended Plan of Reorganization (Doc. No. 785) is **OVERRULED**.

###

Attorney Matthew Kish will serve a copy of this order on all interested parties and file a proof of service within three (3) days of entry of the order.